On behalf of the Appalachians, Mr. Alan Ackerman. On behalf of the people, Mr. Scott Jacobson. Good morning, counsel. Mr. Ackerman. May I approach? You may. Please, the court. Mr. Jacobson, I'm joined at the council table by Joseph Bonero, an Illinois attorney. I'm here to argue on behalf of Marnie Yang. Our issues as laid or set forth in our opening Appalachian briefs start with electronic eavesdropping. And with the court's permission, that's where I would commence my argument. The October 4, 2007, morning phone call from the defendant to Christy Passion should not have been admitted in evidence because it was admitted in violation of 720 ILCS 5 slash 14 dash 3, paren j, paren, two small i's, close, period. Now, the trial attorneys for defendant did not figure that out until post-trial motions where they, at TR 4139, asserted that the trial court should not have admitted that evidence. Now, this was not just a nebulous, irrelevant communication that should not have been admitted. This was an anchor, if you will, of the prosecution's case. Because, according to the prosecution's primary witness, Miss Passion, Marnie Yang had told her the night before that if she dispatched the victim and the victim's child, she would call Miss Passion at work and ask if she wanted to have dinner. That was the putative code. Now, without getting into whether it's true or false, the point is it should not have been admitted. Wasn't there consent, counsel, on both parties' parts to that? I'm sorry? Wasn't there consent? Well, the statute says, and the trial court held, that that was admitted pursuant to quality assurance or quality control when the trial court, prior to the start of the admission of evidence, and I can give you the TR page, which is 2486-8, opined that it would have been admissible because of quality control or quality assurance. But the statute expressly prohibits it. Period. So the state's theory, although they didn't have to espouse a theory because the defense never objected to it at trial, the state's theory would have been consent as it is in the brief unappealed. But the law prohibits the admission of it. That's number one. The statute must be strictly construed. That's Illinois law. On de novo review, Illinois law, it's not admissible in any judicial proceeding, any criminal proceeding, any administrative proceeding. That is the law, if the court pleases. Now, the state, to their credit or discredit, as the case may be, cites federal and Illinois cases having to do with consent. For example, they cite Seja, C-E-J-A, I believe it is, and the Companion case, and a series of federal prison cases where all of those are exempt from the eavesdropping prohibitions. Period. Either by statute or CFR regulation as it goes in the federal courts. So, the fact that I call Sears and I hear on a tape, your call may be recorded for quality control or quality assurance, does not permit Sears to give my tape to the federal government, the state government, and in this case, we don't even know how the state got it. The very tapes we're talking about. The record is silent. So, if the state maintains I have not set it out because it's my burden to do so, I can't do what isn't in the record. It's not there. Is it grave error? Is it plain error? I assert it's grave error. The gravest of error, which is similar to a case this court reversed by way of grave error. It's a Nostrack case. Period. Going a little further, we get to the Christie tapes of February 28, March 1 and 2, 2009. There's a 108A application signed by a Lake County judge, albeit the tapes were going to be made in Cook County, but that's another matter. But what's omitted is that 10 days before, there's a 108B application in Cook County by the same prosecutor, which omitted any mention of the 2007 antecedent applications to wiretap Marnie Yang. Counsel, what provision can you point to that actually requires an Article 108B application to cross-reference an Article 108 application or vice versa? There is none other than, if I may. Could I leave the podium for one moment? Sure. Because I have it right here. Or maybe I have it right here. Under 108A-3-4-CLOSE circa 2009. That refers to the written application, here the state's attorney filed the written application, which must include, as a matter of fact, the word is shall. Shall include all previous applications involving, and I'm paraphrasing now, the same persons and actions taken by the judge on the previous application. Now, I believe that's part of 108A-3-4-CLOSE circa 2009. If it is, the written application here by the same prosecutor did not include the 108B application 10 days before. Well, one is a body wire and the other is a phone tap. That's the one we're talking about. Right, but then the other statute relates to a phone tap. Same person. Well, but they're different applications under different provisions for different things. A body wire is not a phone tap. It's the same individual, the same person who is the target of both applications. And is that what the statute says? The statute says under 108A-3-4-CLOSE all previous applications where this person, this person that you now want to wire tap on has been the subject of a previous application. Application for what? To listen. Listen to the conversations. Okay, so you're taking that language under A and applying it to B. Vice versa, actually. And vice versa, and that's your theory. Yes.  Absolutely. And now the same, of course, goes for one of the 108B applications which omitted a previous 108 application also directed toward this defendant. So you have the 2007-108A directed toward Marnie Yang. That had to do with Sean Gale taping calls and wearing a body wire. You have February 18 of 2009, the 108B where there are two cell phones that they want to target and they are granted permission to listen on her phones. And then you have 10 days later, Christie Pash in 108A again, and that's the one where they get to listen on the phone and taper in person. Now, counsel, regardless of whether or not there is a requirement of cross-referencing, wasn't there testimony from an officer who applied for the 108A application that he, in fact, told the judge about the 108B application? What he said was, and I believe it's quoted in my brief, both my opening and reply brief, that I believe I probably did. Now, if that satisfies the court for the purpose of this statute, which incidentally says all applications shall be in writing, I cannot help that, but on de novo review, I suggest to the court respectfully that the privacy of the citizens of Illinois, which all of this is based on, Illinois has the most strident and stringent anti-eavesdropping statutes in the country. If the theory of the legislation is to be pursued, then you should not sanction, I believe I probably did, as grounds for omitting what should have been in the written application. Didn't he go a little further than that, though? He said that originally, and then doesn't the record reflect that he then emphatically said he did? Doesn't the record go a little further and say he emphatically stated he did? That's what the state represents, and what you see is defense counsel, rather than challenging and really understanding what 108.3.4.4 meant, cited, this is a pretrial proceeding, cited with the very wise police officer and said, okay, you probably did, or words to that effect. Now, again, I'm not changing the record here. I'm asking the court on de novo review whether that's adequate. I get to the last plain error, and this is purely plain error. What about sealing these states? And we have three sets, to be sure. There is nothing in the record, and the state chides me for not showing where in the record there is some sealing. I cannot, because the same statute, 108.A.7.B. Boyd, in two or three paragraphs, lays out the requirements that the issuing judge must at some point listen, make sure the conversations that are taped are consistent with the order, then seal them, then notify within 90 days whomever it is was the target, unless the state can provide a reason not to. There is nothing in this record, and the state points to nothing, that shows these states were ever sealed or sealed properly. So you're suggesting that's plain error because there was no objection at the time? That could be plain or grave, but the lawyers didn't do their job on that. Are you arguing ineffective assistance? You know, it puts the defense in an awkward position on direct appeal, because we don't have a record which shows that the lawyers knew about it and just said, eh. We have no record either way. At this point, though, then you're arguing plain error. I'm arguing grave error, which is consistent with this court's precedent. You're saying that's different than, grave error is different than plain error? Well, grave error is the plainest of plain error, and particularly, again, in an eavesdropping situation, because the leading case from this court is a 14-1 case, period. I also raised the Santiago issue, but it's related to the applications for the Wyatt Ten. Now, Justice Thomas in 2010 wrote People v. Santiago, the opinion for the full court. And what's clear is that 4.2 rules of professional conduct, which prohibit me from communicating with someone's client, apply to the prosecutor even prior to the filing of criminal charges. That's clear. In this case, the question becomes, did the police officers and the state, that is the prosecutor, who had to fully know that Marnie Yang was represented by counsel way back in October of 2007 and January of 2008, can they use the police to get around the fact that she was represented by counsel and now we want to take her? Well, was this raised below? Again, it was not. Is there an adequate record here on that? No. I would urge the court, because it involves the professional conduct of counsel, who incidentally is now a member of the Lake County Circuit Court, did that prosecutor in the zeal of the prosecutor to get this done, to solve this case, defy the rules of professional conduct? If the answer is yes, should suppression result? No. Again, there is no record sufficient other than Marnie Yang was taken into custody by the Lake County Sheriff's Office and the Lake County Task Force on January 4, 2008. She was held in custody for close to 72 hours. During a pre-trial hearing, one of the officers said the person who is in charge of all this was the same state's attorney. So there is a consistency from January 2008 through the entire prosecution of this case, who is in charge. Counsel, would you excuse me just a minute? Sure. Okay. Counsel, the buzzer went off, but we'll give you a couple more minutes on your opening direct argument here, and then you'll have additional, the normal time on rebuttal. I appreciate that. But just so you're aware, the buzzer has gone off. I appreciate that. The trial court's treatment of the defense was unfair for two particular reasons. Number one, everything to do with Sean Gale, all motive evidence, including all the things he did concerning the victim, were excluded by the trial court. And speculative, isn't that correct? Speculative and remote, in part, were the words used by the court. That's absolutely wrong. We have the right, as we show in our reply brief, to present relevant evidence in a first-degree murder case that someone else had no motive. And that was purely and completely excluded. Period. Did you make an offer of proof? Yes. It's all over the record. I have the exact citations. Okay. That was done by representation to the court that such-and-such a witness would testify. Absolutely. And incidentally, and I appreciate that, the state never challenged the offers of proof from the standpoint of their clarity or content. The last thing is, or the next to the last thing, is the letters. Now, the evidence showed, and I think fairly so, that Marnie Yang accessed Sean Gale's computers and, to that extent, took down email addresses for, call it, 17 women. She then sent letters or emails or both to these women a year and a half in advance of anything happening pertinent to this case. That Sean Gale was no good, Nick. He was running around and he had a harem, he had lots of girlfriends, whatever it was. What motive could that be having to do with the murder of a woman as opposed to murdering Sean Gale, who she was mad at? The state posits below that it's part of Illinois 404B. We take issue with that on appeal and I don't think the state can have the best of that argument. Finally, the life and death witness and the state's summation reeks with reversible error, not smacks, reeks. The state, to their credit, conceives that segments of the summation, at the very least, were out of order and wrong, but they claim, as they always do, it's harmless. Well, is it? Is everything always harmless? Does it go to harmless abyss? I don't think so, at least not in this case. Thank you, counsel. You'll have time after rebuttal. Mr. Jacobson. Good morning again, Your Honors. May it please the court. For all the complexity in this case, the complexity of the facts, the arguments that have been raised on appeal, I'm in a unique position because there are absolutely no mysteries in this case. We know why the defendant did what she did. We know how the defendant did what she did. And we have the record below of the defense's challenges to the state's evidence. Those challenges do not include the majority of the argument that the defendant raises in front of this court. This court, the Illinois Supreme Court rules, and the Illinois Supreme Court itself have repeatedly stated that it is axiomatic that a defendant, or any other party for that matter, cannot raise issues for the first time on appeal that were more properly directed to the trial court. Defendant, for whatever reason, seems to believe that this rule does not apply to him. And I would assert that those arguments are outside the boundaries of fairness and are legitimately beyond this court's purview. Now, the defendant's proposed suggestions for all these things, a large part of the wiretap and eavesdrop arguments, come in the reply brief in the forum for the first time as ineffective assistance of counsel. I have asked this court to strike the ineffective assistance of counsel arguments, and I hope that you do so. It is an example of flagrant gamesmanship. It cannot be a response that the state should have come up with a sur-reply to this because no Supreme Court rule contemplates a sur-reply. The Supreme Court rules contemplate an opening brief, a responding brief by the appellee, and a reply brief, a reply brief that is directed to the arguments made by the appellee. So I would assert that the types of arguments that are being raised in this case, particularly with respect to the overhears, are improper. Now, turning to the arguments and the issues that were brought up by defense counsel in the email, defendant's argument regarding the admissibility of the day-of-the-murder conversations at the marketing research exception to the eavesdropping statute, that argument might carry some weight if both of the parties had not consented. In this case, there was ample evidence of consent. Christy Pashtun certainly knew that her employer was monitoring their conversations, and she instructed the defendant as such. That was the whole reason for the defendant speaking to Pashtun in code while she was at work. Now, defendant argues that, well, there's no evidence in the record as to how the state got this information. That is an inquiry to be raised in the trial court. Defendant cannot sit back, participate in the creation of a record, and then come and complain that the record does not show something. He had ample opportunity to present evidence to the trial court, what the state knew, when it knew it, how this evidence was obtained, whether or not Judge Shaines reviewed the 108A tapes. Quite simply put, those arguments are beyond forfeited. So I would assert to this court, I would hope that this court would apply with some strictness the Supreme Court rules in this case. To the extent that we're talking, as I said, about the day-of-the-murder conversations, there was ample evidence of consent. Even the defense is not disputing that. Next, the defendant's argument that the day-of-the-murder conversations are somehow like the case of the Second District case of people versus Sarah Nesterov, well, that's just not true. In Sarah Nesterov, private parties recorded conversations involving the defendant after she was involved in a DUI that resulted in deaths. Where she said that she was going to kill herself. The proper rationale for the admission of that evidence was that it was admissible under an exception for the recording of threats. But that exception only applies to threats that are made to the particular individual who were involved in the recording. So Nesterov is completely inapposite with this case. Next, to the extent that we are having a conversation about the 108B tapes and the state's application for the 108B tapes, I would first ask this court, and though I didn't point to it heavily in the brief, to consider the content of the 108B tapes that are in question as they were ultimately admitted at trial. Those two conversations consist of the defendant and Christy Paschen talking about meeting at Denny's. And that's it. It's not as though they went further beyond that. And then the most damning evidence, the 108A evidence, comes in once they arrive at Denny's. So the overall impact of the 108B arguments, if there was any error, even if that was conceded, is absolutely harmless. To me, it's not a harmless error in abyss. It's calling it what it is. That evidence simply was not as powerful as the defendants making it seem. That they meant at Denny's is undisputed. Turning next to the 108A conversations, again, I would assert that the defendant has not made any substantial showing that the state attempted to deceive the issuing judge, Judge Shaines in this case, and that all of the defendants' assertions notwithstanding, there is simply no prejudice to the defendant here in the application process. Next, the defendant does something very interesting to me. He combines two arguments. And they both have to do with motive, but that is pretty much the only similarity. The third-party motive evidence with respect to Sean Gale and the defendant's poison pen letters as 404B evidence of the defendant's activities. So I will address the Sean Gale evidence separately. In the pretrial proffer, the defense said that they were going to present all of these different things that showed that Sean Gale was having money troubles and was not a gentleman in the past with Ms. Ryder, or any other woman for that matter. But none of that is a motive to commit murder. On the other hand, is the defendant's argument that the state should not have been able to admit evidence of her motive. Her motive in this case was clear cut. It was irrefutable. And the defense's assertion that that evidence was not relevant is belied by the simple fact that it was relevant. It showed her state of mind. It showed what she was thinking. It also showed the effort she was willing to go to to eliminate her romantic competition. So I think not only does the defendant fail to adequately show that the third-party motive evidence was relevant, but I also think the defendant is, to a great extent, overlooking the significant relevance of the evidence of the defendant's own motive. Combining the two issues, simply put, does not make them stronger. And when you consider them in isolation, the defendant is not on strong grounds in either argument. Next, to the extent that the defendant is talking about the rules of professional conduct, I have given this Court cases that show that even a rule of professional conduct violation does not warrant suppression of the evidence garnered. Now, all of that aside, just for a second, the defendant's argument in White, which the defendant compares this case to, was that the prosecution was using an informant as an alter ego of the prosecution. There, the prosecutor was giving the cooperating witness information and questions to ask the defendant, coaching the witness as to how to ask those questions. That's one step removed. Or I should say, rather, the defendant's argument in this case is one step removed from what? Here, the defendant's argument is that the police were acting as the alter ego of the prosecutor, and then that Paschen was acting as the alter ego of the police. And thus, the defendant makes the equivocation that somehow Paschen was acting as the alter ego of the prosecutor. There is simply put zero evidence in this case that the prosecution had anything to do with Christy Paschen at the time that she was used as an informant against the defendant. And defendant's assertions about that being in the record consist of a conversation where the prosecutor, during the directive of Christy Paschen, talks about having spoken with her earlier that day to go over the exhibits in the trial. That doesn't show that Paschen was coached in February of 2009 to elicit incriminating statements from the defendant using the prosecutor's tradecraft. So, to the extent the defendant makes that argument, it's neither supported by the law nor the facts of this case. Last, with respect to the life-death witness and the autopsy photos and the crime scene video and the other evidence, the defendant is invariably challenging. I know that the defendant is not making a big deal about that in front of this court, and I would assert to you that that's because many of those exhibits are not in the record, namely the crime scene video. Defense comes back in the reply brief and concedes that his comments aren't based on an actual viewing of the video, which this court does not have. They're mine from defense counsel's comments or trial counsel's comments to the court. And those comments to the court, interestingly enough, if you go back into the record, show different portions where the state, the defense, and the trial court judge all did their level best to minimize the exposure of unnecessarily gruesome information to the jury. So, to the extent the defendant is making that argument, in part, this court called it incredulous that counsel would ask this court to object to the gruesomeness of photos that counsel has failed to provide this court. I would assert that the same rationale applies here. What happened to the video? I don't know. It's possible that it's with the Lake County Circuit Court Clerk's office. It's possible that it was returned to the state's attorney's office. I know that it was admitted at trial. I know that it wasn't sent back to the jury room, and I can only divide those things from the record. I mean, I have looked into it, and I can't go beyond, I can't provide this court any more information other than to say that the defendant is the appellant in this case, and it's his burden to provide the record to support his claims. So, all that being said, it's not as though defense counsel is saying that he somehow tried to get this evidence, and it was unavailable to him. You know, for all we know, he never tried. And it strikes me as, I'll put it mildly, to say that it's interesting. Next, the defendant's argument about closing arguments. Nowhere in the defendant's series of sprawling assertions that make up the last third of his brief does even the defense say that the prosecutor's comments in this case, while probably outside the bounds of legitimate prosecutorial argument, outside the bounds of fairness, maybe not the most well-stated argument, but all that aside, even the defense doesn't claim that that one statement and argument alone is the reason the defendant was convicted in this case. So, I would assert that even the defendant, while he may be pointing out an error, is not really complaining about the magnitude or the severity of it. Finally, I believe this is the last issue about the accomplished witness instruction for Christie Passion. As this court well knows, that instruction, the committee comments for that instruction indicate that it's only to be given where the defendant is accountable, or where the accomplished witness is accountable for the crime. And while Christie may have committed a number of crimes in her own right, and whatever her personal perceptions might have been as far as leniency when she was arrested by the police in February of 2009, the record is simply bereft of any evidence that would show that she was an accomplice, an accountable person for the murder of Ronnie Ryder and her daughter. So, for the defense to make that argument, once again, is an argument that is not supported by the record. I would ask this court to enforce the Supreme Court rules that apply to the fairness of the appellate process. I would assert that the defendant has come in here and made plenty of arguments, and while those arguments may be interesting, and they may merit some address, they don't, in any sense of the word, excuse his failure to meet his burden of truth to support his own arguments. And with that, I would urge this court to affirm the defendant's conviction. I have a couple of questions. Yes, Your Honor. Ms. Kurakowski, I hope I'm pronouncing her name correctly. Kurakowski. Why was she ruled out as a suspect? She had a, I can't remember if it was for work or if it was for a job interview. An alibi. Yeah, she did have a solid alibi for the time, and the police did investigate her heavily. There was some portion of it that did make the record, I believe, Phil, about, I believe there was some portion that made the record about the extent of her alibi, but she did have one that I'm told was airtight. There was a question about the ultrasound photograph. Yes. And whether or not, was the picture that was, or the representation, I don't know if it's a photo or copy, that was admitted, was that the one taken from the victim's home? No. There is, if you look at the crime scene videos on the refrigerator, there's a picture of the ultrasound, and actually that was the only way I believe that the, to the extent that there was an ultrasound admitted, it was that it was the tiny portion, the tiny corner of the refrigerator. To show that the child was alive. To show that the child, I mean, Ronnie Ryder had put that on her refrigerator to show that. That's corroborated, of course, by the defendant's testimony about what she saw. It's not that the defendant took the ultrasound. She did take a number of documents from Ms. Ryder's apartment, but she didn't take the ultrasound photo. The only ultrasound that was introduced, as I said, is that small, barely visible, I mean, we know what it is because we know what an ultrasound looks like, but it wasn't as though there was a separate ultrasound photo that was introduced and paraded in front of the jury. That was it. As far as the ultrasound goes. Was there ever an offer of proof made by the defense as to any witness, other, or let me just strike that, what offer of proof was made in terms of what witnesses would be called to testify regarding the third-party motive of Sean Gale? I believe they talk about, and now I can't remember the woman's name, unfortunately. The co-worker? Yeah, the co-worker who identified the victim's medical alert bracelet as belonging to the victim. She would have been a witness who had seen Roddy Ryder in the bathroom crying about Gale. What's important to emphasize in all that, obviously, is that Ryder wasn't saying that Gale had threatened her, threatened to kill her. I mean, none of that, there was, simply put, I know the defendant relies heavily on Beeman, this wasn't a whodunit. This wasn't a situation where there were multiple people that had access to the victim at the time of the crime and had various different levels of motive. Was there a suggestion of anyone else testifying? Not in this record. No. No, simply put, there was no, there was nothing further than that. Okay. And so I'm clear, Ms. Passion was aware, actually, both sides were aware when, as the record would reflect, the defendant called Passion at her place of employment based on their long relationship. Everybody knew every call coming in on that phone was recorded. Yes. At least your parties knew. I think I set out, where I respond to that argument in the brief, I set out Passion's testimony on direct where she explains that, you know, she had told the defendant that if the defendant was on notice that conversations coming in were being monitored. That explains why, obviously, Passion and the defendant, or at least the defendant, arranged to speak in a code because she knew that she was being monitored. I view that as objective evidence of consent. Thank you very much. Thank you very much. Mr. Ackerman? May I have a moment for rebuttal? Yes. Thank you. We are not alleging that Christy Passion was an alter ego of the prosecutor. We are asserting only that the police officers who improtuned Christy Passion to take the defendant were the alter ego,  of the prosecutor in this case, not Christy Passion. That is not true. That is number one. Number two, my opponent, and I certainly respect the zeal of his argument, misplaced such as it is, because the Illinois Supreme Court has told us in the cases People v. Williams, cited at page one of my reply brief, that the defendant is not required to assert plain error in her opening brief. Act words, accordingly we believe it would be unfair to require a defendant to assert plain error in his or her opening brief. 193 yields second at page 348. So I don't have to, if Williams is the law, and I think it's the law, so to be chided by my opponent, and hopefully not this court, for not opening my brief while this is plain error, either I'm wrong, or the Illinois Supreme Court in Williams is wrong, or my opponent is wrong. As far as grave v. plain error and eavesdropping, and the same, 720 ILCS 5-14-1 in Nostruc, which my opponent downplays the significance of, and it's this court's opinion, 316, act third, one at page six. Although defendant failed to raise this issue in her appeal, perem, the 1401 eavesdropping issue, goes perem, we consider it because it involves, in our view, a grave error of law. And the court goes on to reverse the conviction of Ms. Nostruc. I thank you for your patience, and I thank you so much for giving me a few extra minutes. Thank you, counsel. At this time, the court thanks counsel for their oral arguments today. The court will take the matter under advisement and render a decision in due course. Court stands adjourned for the day. Thank you.